# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2023

Lyle W. Cayce
Clerk

————————

No. 22-20632

————————

Patrick J. Collins; Marcus J. Liotta;
William M. Hitchcock,

*Plaintiffs—Appellants*,

*versus*

Department of the Treasury;
Federal Housing Finance Agency; Sandra L. Thompson;
Janet Yellen,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-3113

———————————————————————

Before Smith, Southwick, and Higginson, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

This is an appeal challenging the dismissal of plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs are private shareholders of Fannie Mae and Freddie Mac—government sponsored home mortgage companies. Defendants include the Federal Housing Finance Agency ("FHFA"), the Treasury, and the Secretary of the Treasury and Director of the FHFA in their official capacities. This litigation began in 2016 and comes

No. 22-20632

to us on remand from *Collins v. Yellen*, where plaintiffs persuaded the Supreme Court that the statutory provision restricting the President's ability to remove the director of the FHFA violates the separation of powers. 141 S. Ct. 1761, 1783 (2021). We remanded to the district court for the limited purpose of determining whether that unconstitutional removal restriction caused plaintiffs' harm.

The district court concluded that plaintiffs had not plausibly alleged that the removal restriction caused them harm and dismissed their claims. It also dismissed their claims—raised for the first time on remand—that the FHFA's funding mechanism is inconsistent with the Appropriations Clause, concluding that the claims were outside the scope of the *Collins* remand order in violation of the mandate rule.

Plaintiffs raise two issues on appeal. The first is whether the district court erred in dismissing their claims that the unconstitutional removal restriction caused them harm. The second is whether the court erred in dismissing their Appropriations Clause claims.

We reject these contentions. For the reasons that follow, we affirm the dismissal of the removal and Appropriations Clause claims.

I.

Fannie Mae and Freddie Mac are privately owned companies that operate under congressional charter. They are two of the nation's leading sources of mortgage financing. They purchase residential mortgages, pool them into mortgage-backed securities, and sell those securities to investors. By 2007, the companies' portfolio accounted for almost half of the nation's residential mortgage market.

When the housing market collapsed in 2008, the companies experienced large losses on account of the rise in defaults on residential mortgages. Their failure would have had a catastrophic impact on the housing market,

sending it further into a tailspin. Congress attempted to head off this catastrophe by enacting the Housing and Economic Recovery Act ("HERA") of 2008.[1] HERA created the FHFA and gave it the authority to appoint itself as the companies' conservator in certain specified circumstances, such as when the companies possess insufficient assets to meet their obligations. 12 U.S.C. § 4617(a)(3). The companies were placed into conservatorship in September 2008 and remain there to this day. HERA also provided that the FHFA Director would serve a five-year term and could be removed only for cause. 12 U.S.C. § 4512 (b)(2). Like other financial regulators, "the FHFA is not funded through the ordinary appropriations process," *Collins*, 141 S. Ct. at 1172, but rather through annual assessments on regulated entities, *see* 12 U.S.C. § 4516(a).

Soon after HERA became law and the FHFA placed the companies into conservatorship, the FHFA—as conservator—entered into two preferred stock purchase agreements ("PSPAs") with the U.S. Treasury. The Treasury agreed to provide up to $100 billion in funding for each company to draw on if its liabilities exceeded its assets. In return, the Treasury received four benefits: First, it had the option to buy 79.9% of the companies' common stock at a nominal price and receive all associated benefits. Second, it received one-million shares of senior preferred stock in each company. That preferred stock had a liquidation preference equal to $1 billion per company with a dollar-to-dollar increase if the companies drew from the $100 billion capital commitment.[2] Third, the Treasury was entitled to quarterly cash

---

[1] Pub L. No. 110-289, 122 Stat. 2654 (2008) (codified as amended at 12 U.S.C. § 4501 *et seq.*).

[2] A liquidation preference is a preferred shareholder's right to receive a specified distribution before common stockholders receive anything. *See, e.g.,* Michael Klausner & Stephen Venuto, *Liquidation Rights and Incentive Misalignment in Start-Up Financing*, 98 Cornell L. Rev. 1399, 1404-07 (2013). In this case, if either company is liquidated,

No. 22-20632

dividends at an annual rate equal to 10% of the current liquidation preference. Fourth, it was entitled to a quarterly commitment fee.

The Treasury and the FHFA have made several amendments to the initial PSPAs. Most relevant here is the third amendment. Because of the companies' continued losses, they had drawn large amounts from the Treasury's capital commitment. That increased the size of the Treasury's liquidation preference, which resulted in the companies' having to pay a larger quarterly cash dividend to the Treasury. To meet that increased obligation, the third amendment imposed a "Net Worth Sweep," which divorced the companies' dividend obligations from the Treasury's liquidation preference and required them to pay the Treasury nearly their entire net worth every quarter as a dividend. The Sweep ensured that any value the companies generated would go to the Treasury and not to junior preferred and common stockholders such as plaintiffs.

When President Trump took office in January 2017, his Administration announced two overarching goals for the companies: (1) End the conservatorships and (2) end government ownership by selling the Treasury's shares. But the President was unable to nominate his own FHFA Director immediately because in December 2013, President Obama had nominated—and the Senate had confirmed—Melvin Watt, whose five-year term expired in January 2019.

Upon the expiration of Director Watt's term, President Trump nominated Mark Calabria to serve as FHFA Director, and the Senate confirmed Director Calabria in April 2019. But before the companies could exit the

———————————————

the Treasury has the right to be paid back $1 billion plus whatever dollar amount the company had drawn from the Treasury's $100 billion capital commitment. The Treasury also has the right to have proceeds from any new stock issuance be used to pay down the liquidation preference.

conservatorships and transition to fully private entities, they needed to raise outside capital from private investors, to ensure that they would remain financially viable after the Treasury's withdrawal. If the companies exited the conservatorships without sufficient private capital reserves, they risked needing another Treasury-backed capital infusion if they did not rapidly become profitable. Trump Administration officials were expecting a public offering of the companies' stock in 2021 but were unable to hold the offering before the beginning of the Biden Administration.

## II.

Plaintiffs, as individual shareholders of the companies, sued in 2016, challenging the third amendment and the Net Worth Sweep by urging that the FHFA Director's removal protection was unconstitutional. *See Collins*, 141 S. Ct. at 1775. The district court granted summary judgment in favor of the FHFA on the removal claim, but a panel of our circuit reversed. *See Collins v. Mnuchin*, 896 F.3d 640, 646, 676 (5th Cir. 2018) (per curiam). We reheard the case en banc, determined that the removal provision violated the separation of powers, and held that the proper remedy was to sever the removal restriction from the rest of HERA. *See Collins v. Mnuchin*, 938 F.3d 553, 587, 595 (5th Cir. 2019) (en banc).

The Supreme Court granted certiorari and held that the "for-cause restriction on the President's removal authority violates the separation of powers." *Collins*, 141 S. Ct. at 1783.[3] But the Court made clear that, because the Director who adopted the third amendment was properly appointed, no "actions taken by the FHFA in relation to the third amendment [were] void." *Id.* at 1787. Therefore, the Court refused to "hold that the third

---

[3] Plaintiffs also asserted that the FHFA Director exceeded his statutory authority as conservator by adopting the third amendment, but the Supreme Court rejected that theory. *See Collins*, 141 S. Ct. at 1778.

amendment must be completely undone." *Id.* at 1788. That holding, how-ever, did "not necessarily mean . . . that the shareholders have no entitlement to retrospective relief." *Id.* Rather, "it is still possible for an unconstitutional provision to inflict compensable harm[,]" so the Court could not rule out "the possibility that the unconstitutional restriction on a President's power to remove a Director of the FHFA could have such an effect." *Id.* at 1788–89.

*Collins* left it to the lower courts on remand to resolve whether the unconstitutional removal provision caused harm to plaintiffs as shareholders. To provide guidance, the Court gave two hypothetical situations in which the FHFA's removal provision would clearly cause harm.

> Suppose, for example, that the President had attempted to remove a director but was prevented from doing so by a lower court decision holding that he did not have "cause" for re-moval. Or suppose that the President had made a public state-ment expressing displeasure with the actions taken by a direc-tor and had asserted that he would remove the director if the statute did not stand in the way.

*Id.* at 1789.

On remand, the en banc court addressed whether the removal restric-tion caused plaintiffs' harm. *Collins v. Yellen*, 27 F.4th 1068 (5th Cir. 2022) (en banc). A majority decided to remand the question of harm to the district court, but five judges believed the harm issue could be resolved in favor of defendants without further remand. *See id.* at 1069–70 (Haynes, J., dissenting).

Plaintiffs filed an amended complaint on remand, bringing claims under the Administrative Procedure Act ("APA") and directly under the Constitution. They alleged that the unconstitutional removal provision pre-vented the Trump Administration from ending the conservatorships and

government ownership of the companies.[4]  Specifically, they claim that the Trump Administration would have taken a series of steps to accomplish these goals—one of which would have been raising capital from an issue of new stock.  According to plaintiffs, before such a stock issuance occurred, the Trump Administration would need to eliminate the Treasury's liquidation preferences to make the stock attractive to private investors.

But Director Watt supposedly opposed ending the conservatorships, so the Administration could not make any progress during the duration of Watt's term.  This meant the Administration allegedly did not have enough time between the confirmation of Director Calabria in January 2019 and the beginning of President Biden's term in January 2021 to end the conservatorships and government ownership of the companies.

As a result, plaintiffs reason that the unconstitutional removal restriction caused harm because the Trump Administration would have had the time needed to issue new stock had the President been able to remove Director Watt immediately.  Such an issuance necessarily requires elimination of the liquidation preferences, which would have increased the value of plaintiffs' shares.  Plaintiffs thus seek an injunction directing the FHFA and the Treasury to eliminate the liquidation preference on the Treasury's preferred

---

[4] The amended complaint alleged that President Trump's inability to remove Director Watt prevented the Trump Administration from ending the conservatorships and government ownership of the companies.  Plaintiffs claimed their harm allegedly stemmed from the Administration's failure to exit the conservatorships and return the companies to private control.  The amended complaint sought removal of the Treasury's liquidation preferences only to remedy the harm they allegedly suffered from the Trump Administration's failure to exit the conservatorships and return the companies to private control.  Any attempt by plaintiffs in their briefs to claim that they are challenging the Administration's failure to remove the Treasury's liquidation preferences cannot be given effect. *See Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 n.4 (5th Cir. 1986) ("The brief on appeal, of course, is not the appropriate place to amend a complaint.").

stock.

The amended complaint also alleges—for the first time—that the FHFA's financing structure violates the Appropriations Clause. Plaintiffs seek a declaration that the FHFA's funding structure violates the separation of powers and an order vacating and setting aside the third amendment and/or the PSPAs.

Defendants moved to dismiss all counts for failure to state a claim. The district court granted the motion in its entirety and dismissed all claims with prejudice. It held that plaintiffs' removal claims exceeded this court's mandate on remand, and—alternatively—determined that plaintiffs could not plausibly show that the President's inability to remove Watt caused harm because the Trump Administration lacked a concrete plan for ending the conservatorship. Further, even if plaintiffs had such a plan, the court also determined that the pleadings did not show that the Administration would have been able to accomplish it within four years. The district court also dismissed the Appropriations Clause claims, concluding they were outside the mandate of this court's remand order.

## III.

We review a dismissal *de novo*. *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019). We may affirm a dismissal "on any basis supported by the record." *Asadi v. G.E. Energy U.S., L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must present enough facts to state a plausible claim to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail. *See id.* at 555. Facts that only conceivably give rise to relief do not suffice. *See id.* Thus, although we

generally take as true what a complaint alleges, we do not credit a complaint's legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We also "review de novo a district court's interpretation of our remand order, including whether the law-of-the-case doctrine or mandate rule forecloses any of the district court's actions on remand." *United States v. Pineiro*, 470 F.3d 200, 204 (5th Cir. 2006).

## IV.

The district court held that plaintiffs' removal claims "far sur-pass[ed]" the Supreme Court's "mandate for retrospective relief." *See Collins v. Lew*, 642 F. Supp. 3d 577, 586 (S.D. Tex. 2022). Defendants contend that we can affirm on that ground alone.[5]

The mandate rule "provides that a lower court on remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998) (cleaned up). When implementing a mandate, the district court must take "into account the circumstances that [the appellate court's] opinion embraces." *Sobley v. S. Nat. Gas Co.*, 302 F.3d 325, 333 (5th Cir. 2002).

The original complaint sought retrospective relief relating to the "implementation of the Third Amendment." *See Collins*, 141 S. Ct. at 1788–89. The Supreme Court therefore discussed "remedy with respect to only the actions that confirmed directors have taken to *implement* the Third Amendment during their tenures." *Id.* at 1787. The issue *Collins* directed

---

[5] Though this case is technically on remand from our circuit, not the Supreme Court, we remanded "for further proceedings consistent with the Supreme Court's decision." *Collins*, 27 F.4th at 1069. Our court's mandate was therefore identical to the Supreme Court's.

the lower courts to decide, however, was whether the unconstitutional removal restriction inflicted compensable harm on the companies' shareholders. *Id*. at 1789. *Collins* expressly recognized plaintiffs' "claim that the unconstitutional removal provision inflicted harm" and that the "federal parties disputed the possibility that the unconstitutional removal provision caused any such harm." *Id*. Because *Collins* directed the lower courts to resolve that dispute, any harm that plaintiffs could plausibly allege was on account of the President's inability to remove Director Watt is within "the letter and the spirit" of the mandate and not contrary to any "explicit directives" of *Collins*. *See Becerra*, 155 F.3d at 753.

Therefore, the district court erred in holding that plaintiffs' removal claims fell outside the scope of the *Collins* remand order. The mandate rule does not bar our consideration of these claims.

## V.

Defendants next aver that HERA's "anti-injunction" clause prevents judicial review of plaintiffs' removal claims. HERA contains an FHFA-specific provision that "sharply circumscribe[s] judicial review of any action that the FHFA takes as a conservator or receiver." *Collins*, 141 S. Ct. at 1775. Specifically, "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver." 12 U.S.C. § 4617(f). This anti-injunction clause "prohibits relief where the FHFA action at issue fell within the scope of the Agency's authority as conservator, but that relief is allowed if the FHFA exceeded that authority." *Collins*, 141 S. Ct. at 1776.[6]

---

[6] By its terms, § 4617(f) prohibits more than just injunctions, but the parties and the Supreme Court in *Collins* refer to it as either the anti-injunction clause or the anti-injunction provision, so we do the same.

Plaintiffs respond that the anti-injunction clause does not apply because Director Watt exceeded his authority by exercising the powers of FHFA director when, but for HERA's unconstitutional removal protection, President Trump would have removed him from office. *Collins* forecloses that contention by holding that because "the officers who headed the FHFA during the time in question were properly *appointed*[,]" there was "no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office." *Collins*, 141 S. Ct. at 1787–88. This holding means that Watt had the authority to act as the FHFA throughout his tenure as Director because he was properly appointed to the office.

Therefore, the anti-injunction clause applies and prevents courts from taking "any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver." 12 U.S.C. § 4617(f). Because plaintiffs seek injunctive relief that would require the FHFA to take specific actions as conservator to restore plaintiffs to the position they would have been in if not for the unconstitutional removal restriction, they asked the district court to "affect" [*sic*] the "function of the [FHFA] as a conservator[.]" *Id.* So, plaintiffs' APA claims are barred.

But plaintiffs also brought a removal claim directly under the Constitution in count I of their amended complaint. They invoke *Webster v. Doe* to contend that judicial review cannot be precluded for this claim absent a clear statement to that effect. 486 U.S. 592, 603 (1988). *Doe* requires "that where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Id.* The *Doe* rule is an interpretive tool of constitutional avoidance. *Id.* (requiring this heightened showing to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim)*; see also Zummer v. Sallet*, 37 F.4th 996, 1008–13 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1019 (2023). This circuit has refused to find the needed congressional

intent where the statute in question did not "explicitly preclude constitutional claims." *Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998).

In *FDIC v. Bank of Coushatta*, we construed a provision of the Federal Deposit Insurance Act that prevented courts from enjoining any notice or order the Federal Deposit Insurance Corporation ("FDIC") issued to regulated banks under the Act. 930 F.2d 1122, 1125–26 (5th Cir. 1991). The relevant statute said that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i). We said that that language did not preclude review of constitutional claims. *See Coushatta*, 930 F.2d at 1130.[7]

*Coushatta* and *Ellison* defeat the FHFA's argument that § 4617(f) contains the clear statement needed to preclude plaintiffs' constitutional claim. Nowhere does § 4617(f) "explicitly preclude constitutional claims." *Ellison*, 153 F.3d at 254. And § 4617(f) contains language very similar to § 1818(i).[8]

Finally, unlike in *Zummer*, no party has identified "overriding consid-

---

[7] This part of *Coushatta* is not binding because the FDIC conceded that § 1818(i) did not bar constitutional claims. But the panel nonetheless expressly said that it did not find the needed congressional intent to preclude judicial review of constitutional claims. *See Coushatta*, 930 F.2d at 1130. Given that statement and § 1818(i)'s and § 4617(f)'s similar language and context, *Coushatta* is at least persuasive authority. *Cf. Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) ("[D]icta . . . may be followed if sufficiently persuasive . . . .").

[8] *Compare* 12 U.S.C. § 1818(i) ("[N]o court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order."), *with* 12 U.S.C. § 4617(f) ("[N]o court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver.").

erations" that would counsel against applying *Doe's* canon of interpretation.[9]

Defendants also attempt to recharacterize plaintiffs' constitutional claim as an APA claim. They cite Justice Thomas's concurrence in *Collins* for the proposition that the only claims available to plaintiffs are APA claims; they direct us to a district court opinion adopting that analysis. *See Collins*, 141 S. Ct. at 1794 n.7 (Thomas, J., concurring); *Bhatti v. FHFA*, 646 F. Supp. 3d 1003, 1010–11 (D. Minn. 2022). Justice Thomas believes that plaintiffs cannot bring a constitutional claim because Director Watt was not acting unconstitutionally at any time during his tenure. *See Collins*, 141 S. Ct. at 1794–95. The only claim Justice Thomas thinks plaintiffs can assert is an APA-based claim alleging that Watt's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* at 1794 n.7.

Whatever merit that concurrence has, we are bound by the *Collins* majority opinion. Despite recognizing that the unconstitutional removal restriction did not deprive Watt of lawful authority, the *Collins* majority made clear that "it is still possible for an unconstitutional provision to inflict compensable harm." *Id.* at 1789. The majority opinion thus allowed plaintiffs the chance to show that they were harmed here. *See id.* at 1788–89. Nowhere did the majority limit the avenues of relief to the APA.[10] This means that the

---

[9] *Zummer*, 37 F.4th at 1009 (refusing to apply *Doe* where there were "countervailing doubts about the constitutionality" of reviewing the agency decision and the panel did not gravely doubt the constitutionality of precluding review). The FHFA contends that an injunction forcing it to eliminate the liquidation preferences would be extremely intrusive to the Biden Administration. But that bears on the constitutionality of the *remedy* that plaintiffs seek, not our ability to *hear* the constitutional claim.

[10] *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (allowing a party to seek equitable relief when making an "Appointments Clause or separation-of-powers claim").

FHFA is wrong in trying to turn count I into an APA claim because *Collins* specifically said that "the unconstitutional restriction on the President's power to remove a Director of the FHFA" is what could "inflict compensable harm" on plaintiffs. 141 S. Ct. at 1788–89. Count I of the complaint was therefore properly brought directly under the Constitution and was not barred by § 4617(f).

This analysis is buttressed by the nature of the majority opinion in *Collins*. The plaintiffs brought both statutory and constitutional challenges to the third amendment. *See id.* at 1775. The majority dedicated nearly four pages to explaining why § 4617(f) barred plaintiffs' statutory challenge to the third amendment. *See id.* at 1776–79. Yet the opinion did not mention § 4617(f) when discussing whether plaintiffs could show that the unconstitutional removal restriction caused them harm. *See id.* at 1787–89. If § 4617(f) barred consideration of constitutional claims, one would expect the opinion would have noted that. It would be strange for *Collins* to leave open the possibility of retrospective relief based on an unconstitutional removal restriction, give examples of when such relief would be available, and remand the case for resolution of that issue if the entire question was outside our ability to review.

Therefore, § 4617(f) does not bar count I of the amended complaint seeking relief directly under the Constitution, and we may finally proceed to the merits of plaintiffs' contention that HERA's unconstitutional removal provision caused compensable harm.

## VI.

"[A]fter *Collins*, a party challenging agency action must show not only that the removal restriction transgresses the Constitution's separation of powers but also that the unconstitutional provision caused (or would cause)

them harm."[11] *Collins* gave two hypothetical situations in which the FHFA's removal provision would clearly cause harm. Harm would occur if "the President had attempted to remove a director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal." *Collins*, 141 S. Ct. at 1789. The removal provision also would cause harm if "the President had made a public statement expressing displeasure with the actions taken by a [d]irector and had asserted that he would remove the [d]irector if the statute did not stand in the way." *Id.*

*CFSA* "distill[ed] from these hypotheticals three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions" taken by Director Watt. *CFSA*, 51 F.4th at 632. The last prong is satisfied upon a showing that "but for the removal restriction, President Trump would have removed [Director Watt] *and* that the [FHFA] would have acted differently as to" the challenged actions. *Id.* at 633. "[S]econdhand accounts of President Trump's supposed intentions are insufficient to establish harm." *Id.*

*CFSA* made clear that plaintiffs must show a "nexus between the desire to remove and the challenged actions taken by the insulated actor" to prove that an unconstitutional removal restriction caused them harm. *See id.* That makes it necessary to determine exactly which FHFA action plaintiffs are challenging. The briefs are not entirely clear on this issue, but the

---

[11] *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB* (*CFSA*), 51 F.4th 616, 632 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). The grant of certiorari does not change the fact that *CFSA* remains binding precedent in this case unless and until the Supreme Court says otherwise. *See Wicker v. McCotter*, 798 F.2d 155, 157–58 (5th Cir. 1986). In any event, the Court agreed to hear the case only to decide the constitutionality of the CFPB's funding structure. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 143 S. Ct. 981 (2023).

amended complaint appears to be challenging Watt's failure to exit the conservatorships and return the companies to private control and seeks the elimination of the liquidation preferences as a remedy for the harm resulting from this failure.

This means that plaintiffs must allege sufficient facts plausibly to claim that "but for the removal restriction" the Trump Administration would have exited the conservatorships and returned the companies to private control. *See Twombly*, 550 U.S. at 570; *CFSA*, 51 F.4th at 633. Considering all facts asserted in the amended complaint, plaintiffs fail to make that showing.[12]

Plaintiffs' chief support for their removal claim is a letter—written a few months after the *Collins* decision—from former President Trump to Senator Rand Paul.[13] The letter explicitly says that President Trump would have fired Watt from his position as Director. President Trump then says that he would have ordered FHFA to release those companies from conservatorship, sold the Treasury's common stock at a huge profit, and fully privatized the companies.

Plaintiffs allege that the Trump Administration had a five-step plan to accomplish these goals. First, they contend that the Administration would have modified the PSPAs in a way that would remove the Net Worth Sweep and allow the companies to build net worth. Second, the companies would be directed to stop paying the Treasury quarterly cash dividends. Third, the

---

[12] Because we conclude that the amended complaint in its entirety has failed to present sufficient factual allegations to survive a motion to dismiss, we need not reach defendants' contentions that certain facts alleged in the amended complaint cannot be considered.

[13] Plaintiffs attached the letter to the complaint, so it is part of the pleadings. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

No. 22-20632

FHFA would implement a new regulatory framework, setting capital guidelines for the companies once they had been returned to private control. Fourth, the FHFA and the companies would develop plans for raising the financial capital needed to exit conservatorship safely. Fifth, and finally, the FHFA would raise this capital by holding a public sale of new stock. According to plaintiffs, this last step required the elimination of the liquidation preferences because no private investor would purchase shares of the companies while the Treasury retained the right to receive preferred distributions.

The facts in the amended complaint show that President Trump had "a substantiated desire . . . to remove" Director Watt and "a perceived inability to" do so because of HERA's removal restriction. *See CFSA*, 51 F.4th at 632. But the complaint fails plausibly to allege "a nexus between the desire to remove and the" Trump Administration's failure to exit the conservatorships and return the companies to fully private control. *See id.* There is nothing in the amended complaint showing that the companies would have exited the conservatorships and returned to private control if the Trump Administration had a full four years with its chosen director. The amended complaint contains no well-pleaded facts demonstrating that the five-step plan would have been completed if President Trump had an extra two years with Director Calabria as the head of the FHFA. At most, the amended complaint alleges that the Trump Administration would have eliminated the liquidation preferences in preparation for a public offering of shares that was scheduled to take place in 2021, roughly two years after Director Calabria took office.[14]

---

[14] This allegation is inconsistent with the amended complaint's statement that the Trump Administration increased the Treasury's liquidation preference in January 2021. But we allow a plaintiff to plead "allegedly inconsistent factual allegations" in his com-

17

Even if the liquidation preferences had been eliminated and a public offering held two years after Director Calabria assumed office, the plaintiffs plead no facts explaining how a public offering of *new* shares would eliminate the Treasury's *existing* ownership stake in the companies or result in the end of the conservatorships. In other words, all the complaint plausibly alleges is that—after two years with Calabria as the head of the FHFA—the Trump Administration would have held a public offering of shares, and that offering would likely have resulted in the elimination of the Treasury's liquidation preferences. No well-pleaded facts support plaintiffs' allegations that—given another two years of Director Calabria—the Administration would have completed its five-step plan, guided the companies out of conservatorship, and returned them to fully public control before President Biden took office.

Therefore, the facts in the amended complaint only conceivably give rise to a conclusion that "but for the removal restriction" the Trump Administration would have exited the conservatorships and returned the companies to private control. *See Twombly*, 550 U.S. at 570; *CFSA*, 51 F.4th at 633. That level of uncertainty and speculation cannot survive a motion to dismiss, so the dismissal of plaintiffs' removal claims was proper.

## VII.

Turning to plaintiffs' theory that the FHFA's funding structure violates the Appropriations Clause, the district court dismissed these claims after determining that they were outside the mandate of the *Collins* remand order. As discussed above, the mandate rule "provides that a lower court on

---

plaint. *See Leal v. McHugh*, 731 F.3d 405, 414 (5th Cir. 2013). Therefore, we must accept as true that the Trump Administration would have eliminated the liquidation preferences before making a public offering of shares. *Cf. Foster v. City of Lake Jackson*, 28 F.3d 425, 428 (5th Cir. 1994).

remand must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court." *Becerra*, 155 F.3d at 753 (5th Cir. 1998) (cleaned up).  But the mandate rule does not apply when "'there has been an intervening change of law by a controlling authority.'"  *Ball v. LeBlanc*, 881 F.3d 346, 351 (5th Cir. 2018) (quoting *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006)).  One case from our circuit refused to apply this exception when the "constitutional argument existed" in the prior proceeding.  *See McCrimmon*, 443 F.3d at 462.

The majority opinion in *Collins* made clear that it is "possible for an unconstitutional provision to inflict compensable harm."  *Collins*, 141 S. Ct. at 1789.  The Court, however, did not decide whether plaintiffs had demonstrated that "the unconstitutional restriction on the President's power to remove a Director of the FHFA" caused them harm.  *Id.*  Instead, *Collins* remanded, directing that this question was to be "resolved in the first instance by the lower courts."  *Id.*

"[T]he letter and the spirit" of this mandate leave no opening for plaintiffs to bring a challenge under a completely different constitutional theory for the first time on remand.  *See Becerra*, 155 F.3d at 753.  Plaintiffs contend that *Collins* recognized a fundamental shift in the constitutional separation of powers as applied to the FHFA and that the natural follow-on question is whether Congress should be permitted to exercise its constitutional appropriation power over the FHFA.  That may or may not be true, but it does not change the fact that the FHFA's funding structure has nothing to do with the issue for which *Collins* remanded: whether President Trump's inability to remove Director Watt caused plaintiffs' compensable harm.  Considering any other issue would "disregard the explicit directives of" *Collins*. *Becerra*, 155 F.3d at 753.

Plaintiffs also contend that the mandate rule should not apply because

both *Collins* and *CFSA* constituted an "intervening change in law by a controlling authority." *LeBlanc*, 881 F.3d at 351. This circuit's caselaw is not well developed on what counts as an intervening change in law, but whatever the exact contours of this exception may be, neither *Collins* nor *CFSA* qualifies. *Collins* was not an intervening change in law because it was not an Appropriations Clause case.[15] Neither the majority opinion nor any of the four separate concurrences and dissents cited the Appropriations Clause. The majority does refer to the FHFA's funding structure, but merely as a passing reference in the factual summary of the opinion that has no relevance to the legal analysis.[16] Therefore, *Collins* in no way changes the law with respect to the Appropriations Clause and cannot be an intervening change in law that justifies ignoring the mandate rule.

The argument that *CFSA* represents an intervening change in law is stronger because *CFSA* was at least an Appropriations Clause case. *See* 51 F.4th at 635. A careful read, however, shows that *CFSA* did not change any law with respect to the FHFA's funding structure. *CFSA* went to exceptional lengths to limit its Appropriations Clause analysis to its facts: the funding structure of the Consumer Financial Protection Bureau ("CFPB").[17] The opinion even expressly distinguished the FHFA by name.[18] Given that the *CFSA* opinion, by its terms, did not apply to the funding structure of the

---

[15] *Cf. Collins*, 141 S. Ct. at 1770 ("[T]he shareholders argued that the FHFA's structure violates the separation of powers because the Agency is led by a single Director who may be removed by the President only for cause.")).

[16] *See id.* at 1772.

[17] *See* 51 F.4th at 641 ("Even among self-funded agencies, the [CFPB] is unique" because its "perpetual self-directed, double-insulated funding structure goes a significant step further than that enjoyed by the other agencies on offer.").

[18] *See id.* (calling a comparison of the CFPB to the FHFA "mix[ing] apples with oranges").

FHFA, the constitutional argument against the funding structure "existed" in its current form in the prior proceeding. *See McCrimmon*, 443 F.3d at 462. Therefore, *CFSA* was not an "intervening change in the law," and we must abide by the *Collins* mandate. *Id.* at 460.

As tempting as it may be to reach the novel question of whether the FHFA's funding mechanism is constitutional, the issue is not within the mandate of the *Collins* remand order, and plaintiffs have cited no relevant intervening change in law that would justify departing from that mandate. The district court properly invoked the mandate rule to dismiss these claims.

* * * * *

The judgment dismissing the removal and Appropriations Clause claims is AFFIRMED.